## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States Fire Insurance Company,

                Plaintiff,

                                  Civ. No. 05-1043 (RHK/JSM)
                                  **MEMORANDUM OPINION**
                                  **AND ORDER**

v.

Diocese of Winona, Inc., and John Doe 76B,

                Defendants.

Michael R. Gregg, Christopher J. Raistrick, Merlo Kanofsky Brinkmeier & Gregg Ltd., Chicago, Illinois, Christian A. Preus, Jenny L. Sautter, Charles E. Jones, Meagher & Geer, PLLP, Minneapolis, Minnesota, for Plaintiff.

Bruce K. Piotrowski, George F. Restovich, George F. Restovich & Associates, Rochester, Minnesota, for Defendant.

## INTRODUCTION

This case involves the interpretation of two insurance policies under Minnesota law. Defendant Diocese of Winona, Inc. (the "Diocese") purchased two general liability insurance policies from Plaintiff United States Fire Insurance Company ("U.S. Fire"). U.S. Fire brought this action seeking a declaration that it owes no duty to indemnify the Diocese for damages resulting from a lawsuit alleging that a former priest sexually abused a minor. U.S. Fire now moves for summary judgment on the ground that the Diocese's claim is

collaterally estopped because the underlying factual issues have previously been litigated. For the reasons set forth below, the Court will grant the Motion.

## BACKGROUND

This is the Diocese's second attempt to obtain indemnification for damages resulting from the actions of a former priest, Father Thomas Adamson. As described more fully below, the Diocese was previously sued by a parishioner who alleged that Adamson had sexually abused him. See Mrozka v. Archdiocese of St. Paul & Minneapolis, 482 N.W.2d 806 (Minn. Ct. App. 1992). As a result of that lawsuit, the Diocese was ordered to pay in excess of $1 million to the plaintiff; it then brought an action in this Court against several of its insurers, seeking a declaration that it was entitled to indemnification.[1] The Diocese moved for summary judgment, which was denied. See Diocese of Winona v. Interstate Fire & Cas. Co., 841 F. Supp. 894 (D. Minn. 1992) (Interstate I). After a bench trial, the Court ordered the insurers to indemnify the Diocese for the amount of the judgment. See Diocese of Winona v. Interstate Fire & Cas. Co., 858 F. Supp. 1407 (D. Minn. 1994) (Interstate II). The insurers appealed, and the Eighth Circuit reversed, holding that pursuant to terms of a similar insurance policy, Minnesota law did not obligate the insurers to indemnify the Diocese for Adamson's abuse because it was "expected" from the standpoint of the Diocese for purposes of determining whether there was an "occurrence"

---

[1] The Diocese's previous action concerned insurance policies issued by Interstate Fire and Casualty Company, Underwriters at Lloyd's of London, and Centennial Insurance. Diocese of Winona v. Interstate Fire & Cas. Co., No. 90-441 (D. Minn. filed July 27, 1990).

under the policy. See Diocese of Winona v. Interstate Fire & Cas. Co., 89 F.3d 1386 (8th Cir. 1996) (Interstate III). The facts determined in Interstate I, Interstate II, and Interstate III[2] provide much of the basis for the instant action and, accordingly, are set forth in detail below.

## I. Adamson's History of Abuse

From 1958 to 1975, the Diocese employed Adamson as a priest in several school and parish assignments. Interstate III at 1389. During this time, he was repeatedly accused of sexually abusing minors. See id. at 1393; Interstate II at 1409.

From April to June 1974, in response to the continuing allegations, the Diocese provided Adamson with outpatient psychotherapy and, following its completion, inpatient therapy. Interstate II at 1410. When he was discharged from his inpatient therapy, his doctor stated that his condition[3] had "slightly improved" and that he "ha[d] every chance to overcome his problem." Id. He recommended that Adamson "continue in his position, and at the same time seek psychotherapy with his bishop's approval." Id.

Adamson returned to work and, in December 1974, the Diocese was informed of additional similar instances of Adamson's abuse during the 1960s. Interstate II at 1410; Interstate III at 1393. In 1975, after being threatened with the public disclosure of Adamson's abuses, the Diocese transferred him to the Archdiocese of Saint Paul and

---

[2] Interstate I, Interstate II, and Interstate III are collectively referred to herein as Interstate.

[3] Adamson was diagnosed as a homosexual with a "sexual orientation disturbance." Interstate II at 1410.

3

Minneapolis. Id. at 1389; Interstate II at 1410. In January 1985, the Archdiocese of Saint Paul and Minneapolis terminated Adamson's ministry because of publicity and litigation surrounding an unrelated allegation that he had sexually abused a minor. Id.

## II.     Tom Mrozka's Previous Claim of Sexual Abuse

In April 1989, Tom Mrozka sued the Diocese for injuries resulting from Adamson's sexual abuse, which began in 1979 (when Mrozka was 13 years old) and continued until 1987. See Interstate I at 895. After the Diocese admitted negligence, the jury awarded Mrozka $855,000 in compensatory damages and $2,700,000 in punitive damages. The trial court remitted the punitive damages award to $187,000, and Mrozka appealed the remittitur. Mrozka, 482 N.W.2d at 810. The Minnesota Court of Appeals affirmed. Id. at 814.

Following the Mrozka decision, the Diocese's insurers denied coverage for the Mrozka judgment, and the Diocese brought an action in this Court seeking a declaration that it was entitled to coverage. Interstate II at 1409. The insurers argued that there had been no "occurrence" under the policies because Adamson's abuse of minors when the Diocese placed him in new assignments was "expected." (Mem. in Supp. at 4.) The trial court found that the Diocese had not "expected" Adamson's abuse and held that the Diocese was entitled to indemnification for it. Interstate II at 1419. On appeal, the Eighth Circuit reversed, stating that "as a matter of Minnesota law . . . Adamson's abuse of Mrozka was expected by the Diocese for [the] purpose of determining whether there was an occurrence under the policies in question." Interstate III at 1394. The Diocese petitioned the Eighth

4

Circuit for rehearing. (Reply Mem. at 2.) On September 4, 1996, its petition was denied. (Id.)

### III. U.S. Fire's Insurance Policies and the Underlying Action

#### A. The U.S. Fire Policies

U.S. Fire issued two primary general liability insurance policies to the Diocese: one for the period July 1, 1973, to July 1, 1976, Policy Number ML 14 52 45; and one for the period July 1, 1977 to July 1, 1978, Policy Number ML 237409 (the "U.S. Fire Policies"). (Pl. Appx. Ex. 10.) The U.S. Fire Policies provide that U.S. Fire "will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury. . . to which this insurance applies, caused by an occurrence . . . ." (Id.) The U.S. Fire Policies define an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." (Id.)

B.     The Underlying Action

In February 2003, John Doe 76B brought an action against the Diocese in Minnesota state court alleging that, during Adamson's tenure as a pastor at his parish,[4] Adamson had engaged in "unpermitted, harmful and offensive sexual contact" with him and that the Diocese had wrongfully continued to employ Adamson after it knew that he had sexually abused children. (Compl. Ex. A (Compl., John Doe 76B v. Archdiocese of St. Paul & Minneapolis, No. C3-03-7877, ¶¶ 17, 21 (Minn. Dist. Ct. Feb. 19, 2003)).) Following extensive discovery, the parties settled and this action for indemnification followed. (Mem. in Supp. at 5.)

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Cattrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex, 477 U.S. at 322; Mems v. City of St. Paul Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the non-moving party. See Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir.

---

[4] Adamson served as a pastor at John Doe 76B's parish from February 1976 to June 1976. (Compl. at ¶ 12.)

2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).  The non-moving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.  See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## ANALYSIS

U.S. Fire argues that the Eighth Circuit's decision in Interstate III collaterally estops the Diocese from arguing that there was an "occurrence" under the U.S. Fire Policies for John Doe 76B's underlying action.  Collateral estoppel bars relitigation of an issue under Minnesota law[5] if four elements are established:

> (1) the issue was identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue.

Crumley v. City of St. Paul, 324 F.3d 1003, 1006 (8th Cir. 2003) (applying Minnesota law) (citations omitted).

U.S. Fire, as the plaintiff in this action, seeks to utilize "offensive collateral estoppel"[6] against the Diocese.  The Court has "broad discretion in determining whether

---

[5] Minnesota law establishes the preclusive effect of collateral estoppel because Interstate III was decided on the basis of Minnesota law.  Follette v. Wal-Mart Stores, Inc., 41 F.3d 1234, 1237 n.1 (8th Cir. 1994) (stating that the Court "look[s] to state law to determine the effect of the judgment of another federal court in a case where state law supplied the rule of decision").

[6] Offensive collateral estoppel arises when a plaintiff seeks to estop a defendant from re-litigating issues that the defendant previously litigated and lost in another action.

offensive collateral estoppel should be applied." Wills v. Citizens Bank of Silver Lake, 399 N.W.2d 626, 628 (Minn. Ct. App. 1987) (citing White Earth Band of Chippewa Indians v. Alexander, 683 F.2d 1129, 1134 (8th Cir. 1982)). "Generally a court should not allow the use of offensive collateral estoppel where [its] application would be unfair to a defendant." Bogenholm by Bogenholm v. House, 388 N.W.2d 402, 407 (Minn. Ct. App. 1986).

I.      **Full and Fair Opportunity to Litigate**

Plaintiff argues, and Defendant does not dispute, that the first three elements of collateral estoppel are satisfied. The Court agrees; Plaintiffs litigated these same issues in Interstate with respect to nearly identical insurance policies.[7] Accordingly, the Court will analyze the fourth element of collateral estoppel – whether Plaintiff was provided a full and fair opportunity to litigate the issues presented in the instant case.

The Diocese argues that, in Interstate, it was not afforded a full and fair opportunity to litigate whether it "expected" Adamson's continued abuse because 1) the Eighth Circuit engaged in improper fact-finding and 2) the Diocese now possesses expert testimony – unavailable to it in Interstate – that Adamson was provided with the best treatment available at the time. (Mem. in Opp'n at 30-32.) Neither argument is persuasive.

---

Parklane Hosiery Co. v. Shore, 439 U.S. 322, 329 (1979).

[7] The policies in Interstate defined "occurrence" as "an accident or a happening or an event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury. . . during the policy period." Interstate II at 1414. As stated above, the policies here define occurrence as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." (Pl. Appx. Ex. 10.)

8

The Diocese first argues that the Eighth Circuit engaged in improper fact-finding when it "unilaterally declar[ed] certain facts as uncontested or 'undisputed,' when such facts were demonstrably contested or in certain circumstances, demonstrably false . . . ." (Mem. in Opp'n at 30.) Because the Eighth Circuit allegedly engaged in improper fact-finding, the Diocese contends that it was effectively denied a full and fair opportunity to litigate the factual disputes because it is difficult to obtain review of the Eighth Circuit's decision by either the United States Supreme Court or by the Eighth Circuit *en banc*. (Id. at 30-31.)

Although the Eighth Circuit ultimately ruled against it, the record establishes that the Diocese was given a full and fair opportunity to litigate the issues it now asserts the Eighth Circuit decided incorrectly. Throughout the Interstate litigation, the Diocese was represented by competent counsel. It has not alleged that it did not have ample time to conduct discovery or that it was prohibited from introducing evidence in its defense. Accordingly, it has not made a sufficient demonstration that it was not given a full and fair opportunity to litigate the issue. See Ellis v. Minneapolis Comm'n on Civil Rights, 319 N.W.2d 702, 704 (Minn. 1982) (party had a full and fair opportunity to litigate its case when it was represented by counsel, tried the matter, and was allowed to introduce evidence in its defense at trial); see also Oldham v. Pritchett, 559 F.2d 274, 279 (8th Cir. 1979) (explaining that "full and fair opportunity" is dependent on the litigant's opportunities to be heard on the relevant issue). Furthermore, the Diocese provides no legal support for the proposition that a party is not provided a full and fair opportunity to litigate its case unless

9

it is afforded either *en banc* review by the Eighth Circuit or review by the United States Supreme Court.

The Diocese also appears to argue that it was not afforded a full and fair opportunity to litigate its claim in Interstate because it was not able to present the testimony of its current expert, Dr. William L. Seabloom. However, the Diocese's full and fair opportunity to litigate cannot now be undermined, more than ten years later, based on newly proffered expert testimony that purportedly supports its prior claims. Importantly, the Diocese "does not contend that it could not have retained an expert to opine on the same issues as Dr. Seabloom during the Interstate litigation." (Mem. in Opp'n at 31.) It also concedes that some testimony was given regarding the issues now brought forth by Dr. Seabloom. (Mem in Opp'n at 31.) The fact that the Diocese chose not to retain such an expert in Interstate and to rely on the testimony provided at the time does not establish that it was not given a full and fair opportunity to litigate the issue or present its case.

Furthermore, Dr. Seabloom's opinion, even if accepted by the Court, does not distinguish this case from Interstate. Dr. Seabloom opines that Adamson received "the best treatment available at [the] time known to the Diocese and most other organizations." (Restovich at Ex. 38.) This does not, however, provide new evidence that Adamson's continued abuse of children was not expected.[8]

---

[8] Dr. Seabloom also opines that "it was reasonable for [the Diocese] to rely upon the fact that the professionals treating Adamson did not advise [it] that Adamson needed different treatment or should not be assigned to a parish." Dr. Seabloom's legal conclusion, however, is insufficient to overcome the Eighth Circuit's prior determination

Accordingly, the Diocese has failed to provide evidence that it was not given a full and fair opportunity to litigate its claim.

## II.     Unfairness to the Diocese

The Diocese next argues that even if all of the elements of collateral estoppel have been met, it would be unfair to determine that the instant claim is collaterally estopped because Interstate III's reversal of Interstate II created "two inconsistent judgments" between the Eighth Circuit and the District Court.  (Mem. in Opp'n at 23.)  The fundamental flaw in the Diocese's logic is that there is only one judgment in Interstate: that of the Eighth Circuit.  This is because the District Court is "bound by the [appellate] decree and must carry it into execution . . . ."  Thornton v. Carter, 109 F.2d 316, 319 (8th Cir. 1940).  On remand, the District Court "is without power to do anything which is contrary to either the letter or the spirit of the mandate construed in light of the opinion of [the appellate] court deciding the case."  Id. at 320.  Accordingly, the Diocese's argument that it is unfair to collaterally estop the instant claim because Interstate III's holding created two inconsistent judgments is rejected.

The Diocese also argues that collateral estoppel is unfair because the Eighth Circuit engaged in improper fact-finding in reaching its conclusions.  (Mem. in Opp'n at 25.)  In its opinion, however, the Eighth Circuit stated that "the detailed facts of this case are set forth in detail in the district court's opinion . . . and the state court's opinion in the underlying

---

that the Diocese's actions were not reasonable.

litigation." Interstate III at 1389.  The Eighth Circuit, therefore, did not engage in improper fact-finding; rather, it explicitly adopted the facts found by the District Court when it rendered its opinion, and simply reached a different legal conclusion based on those facts.  And, the Eighth Circuit rejected the argument that it engaged in improper fact-finding when it denied the Diocese's petition for *en banc* review.  Even if the Court were inclined to revisit that decision, it is without power to do so.

## CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS ORDERED** that Plaintiff U.S. Fire's Motion for Summary Judgment (Doc. No. 22) is **GRANTED**.  It is **DECLARED** that Plaintiff U.S. Fire has no duty to indemnify Defendant Diocese of Winona for damages resulting from alleged sexual abuse of John Doe 76B by Father Thomas Adamson.  It is **FURTHER DECLARED** that John Doe 76B has no beneficial interest nor right of recovery against U.S. Fire for any claims against the Diocese of Winona arising out of allegations related to the alleged sexual abuse of John Doe 76B by Father Thomas Adamson.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Dated: January  29 , 2007               s/Richard H. Kyle
                                        RICHARD H. KYLE
                                        United States District Judge